**THE STATE** (Thomas Ward and others, prosecutors) vs. THE FRANK AND GUIS- BERT CREEK COMPANY.

The act to enable the owners of the tide swamps and marshes, to improve the same, &c. passed November 29, 1788, *Rev. Laws* 82, and the further supplement to the said act, passed January 22d, 1829, require the concurrence or agreement of the owners and possessors of two-thirds of the land, expressed previously to the ap-

pointment of persons to value or revalue the marsh, swamp or meadow ground, secured by the bank from the overflow of the tide. Not only the actual agreement of two-thirds, but the evidence of that agreement in some legal binding form, ought to precede the appointment and revaluation. The statute gives a special, extraordinary and delegated power, and those who would avail themselves of the advantages it gives them, must take the law for their guide, and regulate themselves by its provisions.

As by the original act, *Rev. Laws* 82, sec. 5, a survey and strict measurement of the quantity held by each owner, is to precede the valuation and assessment, and the valuation is to be made of the land of *each owner separately,* so by the further supplement to the act passed January 22, 1829, there must be a resurvey and a new map, shewing the present owners and quantities, before there can be a lawful revaluation.

----

This was a certiorari removing into this court the proceedings of the Frank and Guisbert Creek Company. The objections taken to these proceedings, and the facts are fully stated in the opinion of the court, delivered by the chief justice.

*Dodd* for plaintiffs in certiorari.

HORNBLOWER, C. J. The Frank and Guisbert Creek Company, was organized in the month of October, A. D. 1808, under the provisions of the act to enable the owners of tide swamps and meadows to improve the same, &c. passed the 29th November, 1788. *Rev. Laws* 82. The first section of that act requires the concurrence of the owners of *two-thirds* of the lands intended to be embraced in the company, to justify the formation of such company. The fifth section directs, that the managers of the company shall cause all the lots and parcels of the marsh, &c. belonging to each owner, *usually* overflowed by the tide, to be " carefully and strictly measured, and a draught or plan to be made, shewing the quantity held by each owner ; and cause a valuation to be made," (by the men appointed as directed in the act) " of the meadow ground of each owner separately ; " and then provides that the moneys to be raised, shall be assessed " ratably on the said meadow, agreeably to the valuation and quantity each owner may have, &c." Under the provisions of this law, a survey, valuation and assessment of the lands of the said company, were made upwards of twenty years since, and the dams, sluices, &c. contemplated by the act were erected.

On the 22d January, 1829, a supplement to that act was

passed; the third section of which provides, that " whenever the *owners* and possessors of *two-thirds* of the marsh, &c. lying within the bounds of any meadow bank company, shall agree to a re-valuation and assessment of the several lots and parcels of such marsh, &c. it shall and may be lawful for the owners and possessors of the same company at a special meeting to be held for that purpose; notice of which, &c. to choose by ballot or otherwise, three or more indifferent and discreet persons, to re-value all the marsh, &c. secured by the banks or dams, from the overflow·of the tides."

From the return made to the certiorari in this case by the company, under the certificate and signature of their clerk, it appears that at a special meeting called for the purpose, and held on the first Monday of April, 1831, three persons were appointed to make a re-valuation; that the persons so appointed met and made a re-valuation on the 20th June, 1831, and that in doing so, they took the number of acres and the names of the owners from a survey and map made in the year 1809, of the several lots of meadow lying within the bounds of the company, shewn and produced to them by the managers.

To the legality of these proceedings, various objections are made by the persons prosecuting this certiorari; and

1st. It is insisted that a re-valuation could not be made without the *previous agreement* of the owners and possessors of *two-thirds* of the land; that no such agreement existed; or at least, there is no proper and legal evidence of the fact.

This, if true, is a radical defect: the concurrence or agreement of the owners and possessors of two-thirds of the lands, lies at the foundation of the proceeding. Any re-valuation, or appointment of persons to revalue, without the agreement and consent of two-thirds of the owners and possessors *previously* expressed, is altogether unauthorized. The statute does not prescribe the manner in which such agreement shall be ascertained or expressed, or how it shall be evidenced. It must, however, exist, and there must be evidence of the fact, to legalize and give effect to the re-valuation. There ought, at least, to be some record or document shewing the names of *all* the owners and possessors and of the number of acres owned and possessed by each, and some designation of the concurring

owners and possessors, by which it might appear that those who agreed to a re-valuation, constituted the owners and possessors of at least two-thirds of the lands.

Upon inspecting the copies of the minutes or proceedings of the company, which have been certified to this court by their clerk, we find an entry in the following words : " Agreeably to the expressed wish, consent and agreement of more than two-thirds of the owners and possessors of meadow ground lying within the bounds of the Frank and Guisbert Creek Company, that a re-valuation of the several tracts and parcels of meadow ground lying within the aforesaid bounds, should be made ; and that a meeting should be called on the first Monday in April, 1831, for the purpose of appointing three or more disinterested men to re-value the same. The managers, therefore, having ordered notice to be given of such meeting, the following is a copy of the notices which *have been* put up, this 7th day of March, 1831."

This appears, upon the face of it, to be a memorandum or entry made by the clerk on the day on which he put up notices for the special meeting, and *after* he had put them up. The entry does not purport to be a minute or record of any resolution, vote or proceeding of the company, or of the board of managers ; but only a memorandum of what the clerk had done, in pursuance of a previous agreement of the owners, &c. and of an order of the managers. But when the owners expressed such wish and agreement, or in what manner they did so, or what evidence he had of it, or when the managers fixed the time for the special meeting, or made any order that notices should, be put up, no where appears.

The annual meeting of the company preceding the date of that entry, was held on the fifth of April, 1831 ; and we are furnished with a certified copy of the proceedings of that meeting ; but they do not even allude to the subject of a re-valuation ; nor does there appear to have been any meeting of the company or of the managers between that day and the 7th of March, 1831, when the clerk made the entry in the minutes which had just been quoted.

There is, however, among the papers sent up and certified by the clerk, a paper dated the 28th August, 1832, signed by a

number of persons claiming to be the owners and possessors of more than two-thirds of the land, certifying that they did severally agree in the fall of the year, 1830, to a re-valuation, &c., and did *understand* at the same time, that a special meeting would be held;" &c. and they further certify, that they have examined the re-valuation and assessment, and are satisfied with the same.

But this document, even if sufficiently verified, comes too late. The very reason why the subscribers to it are satisfied with the re-valuation, may be the ground of dissatisfaction on the part of those who prosecute this certiorari.

Not only the actual agreement of two-thirds, &c. but the evidence of that agreement, in some legal and binding form, ought to *precede* the appointment and re-valuation. There is no doubt but the signers of the certificate have certified truly, that they had severally agreed to a re-valuation *in the fall* of 1830, and that they understood there was to be a special meeting, &c. But in the absence of all written evidence at the time of such agreement, and from the tenor of the certificate itself, we are left to the inference that the agreement was a mere verbal assent or acquiescence on their part, that might afterwards be avowed or disavowed, as interest or caprice might dictate, and which might at best depend upon the uncertainty of parol testimony, if proof should become necessary.

It would neither be discreet or desirable to embarrass the operations of these meadow companies, by requiring of them a strictness and formality in their proceedings, that would defeat the beneficial purposes for which they were instituted. Nevertheless, the rights of individuals must be protected. The powers granted to the company by the legislature, are extensive, and of an important and serious character; not only imposing obligations and burdens on individuals against their will, and it may be against their interest, but affecting the rights and property, if not the very inheritance of women and children. It is a special, extraordinary, and delegated power; and those who would avail themselves of the advantages it gives them, must take the law for their guide, and regulate themselves by its provisions.

2d. It is objected, that by a just construction of the supple-

ment in connection with the original act, there ought to be a re-survey, when there is a re-valuation. We have seen, that by the fifth section of the original act, a survey and strict measurement of the quantity held by each owner, was to precede the valuation and assessment ; and the valuation was to be made of the land of *each* owner *separately.* The re-valuation is to be made in the same manner ; that is, " of the several lots or parcels." How such re-valuation of the lands " of each owner separately," could be made without a previous resurvey, is not perceived, unless the lands were now held by the same owners and in the same quantities, as when the original survey was made. ˙ But it appears by the affidavits taken in the cause, (as might reasonably be expected, after a lapse of more than twenty years) that the lands have changed owners ; lots have been divided and subdivided ; original proprietors are dead ; some of them sold out entirely, and new owners taken their places ; yet no resurvey and map was made previous to the re valuation and assessment. The appraisers took the number of acres and names of owners from the old survey and map, made in 1809.

This proceeding was clearly wrong, When the legislature authorized a re-valuation, they undoubtedly intended that the lands of the different owners should be valued or appraised " separately," as was required to be done by the original act ; so that each owner might be able to know whether the assessment imposed on him, was in proportion to the quantity and valuation of his land. Instead of which, upon looking at the re-valuation, it appears, that the appraisers have re-valued the *entire* original tracts as set down to the names of the original owners, without regard to the present proprietors, or to the quantity or location of their respective parts of the original tracts. For instance, the lot formerly belonging to Abraham Garrabrants, is valued at one entire lot, although the appraisers set it down as now belonging to five different owners, whose names are given ; but whether as tenants in common or in severalty, or in what proportions, or where these respective parts are located, does not appear. There is nothing of course, on the whole proceeding to shew how much is to be assessed against these separate and individual owners ; and though the

general tract, when belonging to one person, may fairly be valued at one average sum per acre, yet one part may be of less value than another, and when in the hands of a separate owner, ought to be appraised at its own value, as a separate and distinct property. I think, therefore, there ought to have been a resurvey and a new map, shewing the present owners and quantities, before there could be a lawful re-valuation. And for these reasons, that the proceedings must be set aside.

FORD, J. concurred.

Proceedings set aside.